O

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANNE VALADEZ and VALENTINO GONZALEZ, | Case No. 2:20-cv-03724-JWH-SKx |
| Plaintiffs, | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF No. 111]** |
| v. | |
| COUNTY OF LOS ANGELES; DEPUTY HUNZINGER; DEPUTY VERA; FIELD SUPERVISOR DEPUTY MICAH LOPEZ; DEPUTY JAVIER HERNANDEZ; DEPUTY JOEL J. MACIAS; SERGEANT POLANCO; LIEUTENANT PATTERSON; CAPTAIN KERRY A. CARTER; SERGEANT RICHARD F. ALVAREZ; DEPUTY REFUGIO IBARRA; DEPUTY GOMEZ; SERGEANT ADAMS; SERGEANT VARELA; CHIEF VIERA; WATCH COMMANDER DEPUTY STRONG; SERGEANT BRIAN ANDERSON; DEPUTY GUILLERMO ALVAREZ, JR.; DEPUTY NICOLAS MARINELLI; SERGEANT MARY DE BELLA; DEPUTY ADRIAN DE CASAS; DEPUTY JAN WONG; DEPUTY JOSHUA HERNANDEZ; and DOES 8 through 10 inclusive, | |
| Defendants. | |

Before the Court is the motion[1] of Defendants County of Los Angeles; Deputy John Hunziker;[2] Deputy Eliezer Vera, Jr.; Deputy Jaime Gomez; Sergeant Micah Lopez;[3] Deputy Joel Macias; Sergeant Jesse Polanco; Sergeant Richard Alvarez; Deputy Refugio Ibarra; Sergeant Andrea Varela; Lieutenant Dru Strong;[4] Lieutenant Paul Patterson; Commander Kerry Carter;[5] Chief Eliezer Vera;[6] Deputy Guillermo Alvarez, Jr.; Lieutenant Mary De Bella;[7] Detective Adrian De Casas;[8] Deputy Nicolas Marinelli; Deputy Jan Wong; Lieutenant John Adams;[9] and Deputy Joshua Hernandez (collectively, "Defendants"), for summary judgment on the Second Amended Complaint[10] of Plaintiffs Anne Valadez and Valentino Gonzalez.  The Court conducted a hearing on the Motion in April 2023.  After considering the papers filed in support and in opposition,[11] as well as the argument of counsel at the hearing, the Court orders that the Motion is **GRANTED**, for the reasons set forth herein.

## I.  BACKGROUND

### A.  Procedural History

Plaintiffs commenced this case in April 2020 and filed their operative Amended Complaint in September 2022, in which they assert the following nine claims for relief:

- Deprivation of Constitutional Rights—Conspiracy (42 U.S.C. § 1983);
- Excessive Force and Denial of Medical Care (42 U.S.C. § 1983);

---

[1]    Defs.' Mot. for Summ. J. (the "Motion") [ECF No. 111].

[2]    Plaintiffs refer to Deputy John Hunziker as "Deputy Hunzinger."

[3]    Plaintiffs refer to Sergeant Micah Lopez as "Field Supervisor Deputy Micah Lopez."

[4]    Plaintiffs refer to Lieutenant Dru Strong as "Watch Commander Deputy Strong."

[5]    Plaintiffs refer to Commander Kerry Carter as "Captain Kerry A. Carter."

[6]    Plaintiffs refer to Chief Eliezer Vera as "Chief Viera."

[7]    Plaintiffs refer to Lieutenant Mary De Bella as "Sergeant Mary De Bella."

[8]    Plaintiffs refer to Detective Adrian De Casas as "Deputy Adrian De Casas."

[9]    Plaintiffs refer to Lieutenant John Adams as "Sergeant Adams."

[10]    Plaintiffs filed two documents captioned as "Second Amended Complaint"—ECF No. 63 on August 23, 2022, and ECF No. 89 on September 30, 2022.  Plaintiffs' operative pleading is the later-filed document.

[11]    The Court considered the documents of record in this action, including, in particular, the following papers:  (1) Second Am. Compl. (including its attachments) (the "Amended Complaint") [ECF No. 89]; (2) Motion (including its attachments); (3) Pl.'s Opp'n to the Motion (the "Opposition") [ECF No. 132]; and (4) Def.'s Reply in Supp. of the Motion (the "Reply") [ECF No. 145].

- Unreasonable Search and Seizure (42 U.S.C. § 1983);
- Custom, Practice, or Policy Causing Violation of Civil Rights (42 U.S.C. § 1983);
- Negligence (Cal. Govt. Code §§ 815.2(a) & 820(a));
- Battery (Cal. Govt. Code §§ 815.2(a) & 820(a));
- Violation of California Bane Act (Cal. Civ. Code §§ 52 & 52.1);
- Intentional Infliction of Emotional Distress (Cal. Govt. Code §§ 815.2(a) & 820(a)); and
- First Amendment Retaliation (42 U.S.C. § 1983)

Defendants filed the instant Motion in January 2023, in which they contend that Plaintiffs cannot establish the existence of a genuine dispute of material fact with respect to any claim in their Amended Complaint and that Defendants are entitled to judgment on all of Plaintiffs' claims as a matter of law. Plaintiffs opposed, and the Motion is fully briefed.[12]

## B.   Evidentiary Objections

"A trial court can only consider admissible evidence in ruling on a motion for summary judgment." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002); *see also In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385 (9th Cir. 2010) ("A district court's ruling on a motion for summary judgment may only be based on admissible evidence."). At summary judgment, a district court "must also rule on evidentiary objections that are material to its ruling." *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010). "A court can award summary judgment only when there is no genuine dispute of material fact. It cannot rely on irrelevant facts, and thus relevance objections are redundant." *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006). Additionally, "when evidence is not presented in an admissible form in the context of a motion for summary judgment, but it may be presented in an admissible form at trial, a court may still consider that evidence." *Id.* at 1120. All evidentiary objections on which the Court does not expressly rule below—because the Court did not rely on that evidence in reaching its decision on Defendants' Motion—are **OVERRULED** as moot.

Although the Court will address the specific evidentiary objections that are germane to summary judgment, both sides rely on so-called "self-serving" declarations throughout their Statements of Facts and Evidentiary Disputes. The Ninth Circuit has "previously acknowledged that declarations are often self-serving, and this is properly so because the party submitting it would use the declaration to support his or her position." *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015). "Although the source of the evidence may have some bearing on its credibility and on the weight it may be given

---

[12]   *See* Opposition; Reply.

by a trier of fact, the district court may not disregard a piece of evidence at the summary judgment stage solely based on its self-serving nature." *Id.* "However, a self-serving declaration does not always create a genuine issue of material fact for summary judgment: The district court can disregard a self-serving declaration that states only conclusions and not facts that would be admissible evidence." *Id.*

## C.   Facts

Plaintiffs Valadez and Gonzalez are a couple who live in Huntington Park, California. They allege that they are victims of an ongoing campaign of "harassment and retaliation by the [Los Angeles Sheriff's Department (the 'LASD')] and its deputies for several years." [13] Plaintiffs live in a mobile home park in a mixed-use neighborhood. That neighborhood is considered a high-crime area because of frequent reports to the LASD of vehicle thefts, shootings, and the use and sale of narcotics. [14] In their Amended Complaint, Plaintiffs recount several interactions with LASD officers. Those interactions are detailed below.

### 1.   July 27, 2018

On July 27, 2018, Plaintiffs were sitting in their car in front of their residence when Deputies Adrian De Casas and Jan Wong drove past "in a menacing, intimidating matter [*sic*]." [15] De Casas asked Gonzalez about the expired registration on Plaintiffs' vehicle, but the deputies left without issuing any citation to Plaintiffs. [16] Valadez then filed a complaint with the LASD, claiming that De Casas and Wong harassed Plaintiffs because of Plaintiffs' prior interactions with the LASD. In response, non-party Sergeant Martin

---

[13]   Amended Complaint ¶ 30.

[14]   Defs.' Statement of Facts and Conclusions of Law ("Defendants' Statement of Facts") [ECF No. 111-1] ¶ 3. Plaintiffs object to that fact. *See* Plaintiffs' Evidentiary Objections [ECF No. 133] ¶ 3. That objection is **OVERRULED**. Defendants rely on testimony from Lieutenant Angela Ingham the in support of that fact; Ingham has personal knowledge of the reporting of crimes to the LASD in Plaintiffs' neighborhood. *See* Decl. of Lieutenant Angela Ingham, Ex. C [ECF No. 111-3].

[15]   Opposition 1:20-23.

[16]   *Id.* at 2:7-8. Defendants object to the facts concerning De Casas and Wong. *See* Defendants' Evidentiary Objections [ECF No. 146] ¶¶ 1, 4-6, 8-11, & 14. Those objections are **OVERRULED** because Plaintiffs submitted a complaint to the LASD that verifies the pertinent facts. *See* Decl. of Na'Shaun L. Neal In Supp. of the Opposition (the "Neal Declaration") [ECF No. 135], Ex. 5 [ECF No. 135-5].

Harney conceded that it "appears employee conduct could have been better."[17]  Harney also noted that De Casas and Wong failed to log their contact with Plaintiffs.[18]

### 2.    December 27, 2018

The next incident occurred four months later, when Deputies Joshua Hernandez and Joel Macias escorted non-party Salvador Zavala, a social worker with the Los Angeles County Department of Children and Family Services, to serve a document on Gonzalez at Plaintiffs' residence.[19]  The document concerned the termination of Plaintiffs' parental rights relating to their shared children.  Zavala requested a police escort in view of LA County social workers' past unpleasant interactions with Plaintiffs.[20]

When Zavala and the deputies arrived at Plaintiffs' residence, Zavala opened the unlocked front gate and knocked on the front door of Plaintiffs' home.[21]  There was no answer, so Zavala and the deputies departed.[22]  Just as Zavala and the deputies exited Plaintiffs' front gate, Valadez drove up.  Valadez confronted Zavala and the deputies from Plaintiffs' vehicle and recorded the interaction on her cell phone.[23]  Hernandez warned Valadez that Valadez nearly ran over his foot while talking to him through the car window, and he admonished Valadez that driving while using her cellphone was illegal.[24]  Valadez told the deputies that she did not want them on Plaintiffs' property and that she perceived their presence as a threat.  Macias responded that he was going to issue her a citation.  Macias then handcuffed and detained Valadez.[25]

---

[17]    Pls.' Seperate [*sic*] Statement of Additional Material Facts ("Plaintiffs' Statement of Facts") [ECF No. 134] ¶¶ 15-19.

[18]    *Id.* at ¶ 18.

[19]    Defendants' Statement of Facts ¶¶ 11 & 12.

[20]    *Id.* at ¶ 10; Decl. of Social Worker Salvador Zavala (the "Zavala Declaration") [ECF No. 111], Ex. D [ECF No. 111-3] ¶ 4.  After considering oral argument at the hearing, the Court **OVERRULES** Plaintiffs' objection to that fact.

[21]    Defendants' Statement of Facts ¶¶ 13 & 14.  Plaintiffs object to Defendants' evidence that the gate was unlocked.  *See* Plaintiffs' Evidentiary Objections ¶ 13.  Plaintiffs' objection is **OVERRULED** because Valadez testified that she did not recall how she locked the gate, and Plaintiffs do not adduce sufficient facts regarding how Valadez knew that the gate was locked. *See* Neal Declaration, Ex. 2 ("Exhibit 2") [ECF No. 135-2]; Valadez Depo. Tr. 125:12-17; *see also* Neal Declaration, Ex. M2 ("Exhibit M2") [ECF No. 135-31] (showing the open and unlocked gate with no visible signs of forced entry by Defendants).

[22]    Defendants' Statement of Facts ¶ 15.

[23]    *See* Exhibit M2.

[24]    *Id.* at 00:20-30.

[25]    *Id.* at 01:25-30.

Sergeant Jesse Polanco arrived on the scene shortly thereafter, and Valadez recorded the interactions on her cell phone.[26]  Ultimately, the deputies chose not to issue a citation to Valadez.[27]  Polanco provided Valadez with his business card and badge number so that Valadez could file a complaint, which she did later that day.[28]  Lieutenant Paul Patterson received Valadez's complaint and collected her statement and cell phone video of the interaction.[29]  After reviewing the witness interviews and all of the evidence, Patterson concluded that Macias and Hernandez's conduct was reasonable.[30]

### 3.    January 19, 2019

Three weeks later, Valadez encountered two unidentified LASD deputies on the sidewalk near the front gate of Plaintiffs' residence.  While recording the event on her cell phone, Valadez confronted the deputies and asked why they were trying to enter her property.  After briefly peering over Valadez's gate and telling her who they were seeking, the deputies walked past Plaintiffs' residence and entered the front gate of their neighbor's property.[31]

### 4.    January 22, 2019

The parties agree that Deputy Macias and non-party Deputy Anthony Lopez arrested Gonzalez on January 22, 2019, but the facts surrounding the apprehension are disputed.  Defendants claim that the deputies detained Gonzalez during a traffic stop because the windows on Plaintiffs' vehicle were excessively tinted, in violation of California law.[32]  During the stop, Macias ran Gonzalez's information through a police

---

[26]    *See* Neal Declaration, Ex. M3 [ECF No. 135-32].

[27]    Plaintiffs' Statement of Facts ¶ 60.

[28]    Defendants' Statement of Facts ¶ 33.

[29]    *Id.* at ¶ 40.

[30]    *Id.* at ¶ 43. Defendants object to Plaintiffs' inclusion of facts stating that Valadez received threatening messages concerning her posting of the video of the incident on Facebook and that those messages expressed that Macias would "come to her home again." *See* Defendants' Evidentiary Objections ¶¶ 64 & 65. Defendants' objections are **SUSTAINED**. Valadez offers deposition testimony and her complaint to the LASD concerning the incident as evidence for those facts. *See* Plaintiffs' Statement of Facts ¶¶ 61-65. Valadez's complaint does not mention that she received threatening Facebook messages, and it does not support her factual statement. *See* Neal Declaration, Ex. 6 [ECF No. 135-6]. With respect to Valadez's deposition testimony, Defendants' Statement of Facts ¶ 61 refers to Exhibit 2 146:14-18, but page 146 is missing from that exhibit. Furthermore, although Valadez testified that she kept a copy of the threatening Facebook message, Plaintiffs fail to include that message as an exhibit. *See id.* at 148:13-18.

[31]    Neal Declaration, Ex. M4 [ECF No. 135-33].

[32]    Motion 4:8-13.

database and discovered that Gonzalez had an outstanding warrant.  Macias and Anthony Lopez[33] then arrested Gonzalez pursuant to that warrant.[34]

Plaintiffs present a different version of the facts.[35]  Gonzalez claims that on an unspecified day in January 2019, he was retrieving his mail when Macias and an unidentified deputy appeared, handcuffed him, and detained him in the back seat of their patrol car.[36]  Gonzalez maintains that the deputies drove a few blocks away, then told Gonzalez that if Plaintiffs did not drop their December 27, 2018, complaint, then they would take Gonzalez to jail.[37]  The deputies then released Gonzalez, who walked back to Plaintiffs' house.

Plaintiffs contend that days later, on January 22, 2019, Macias and Anthony Lopez arrested Gonzalez on the outstanding warrant.[38]  They transported Gonzalez to the LASD Century Station and booked him.

### 5.   March 17, 2019

A few weeks later, on March 17, 2019, at approximately 1:30 a.m., Deputies Refugio Ibarra and Nicolas Marinelli conducted a traffic stop on Plaintiffs' vehicle. Plaintiffs' vehicle had a broken license plate light and excessive window tint, in violation

---

[33]    The Court refers to non-party Deputy Anthony Lopez as "Anthony Lopez" to distinguish him from Defendant Sergeant Micah Lopez.

[34]    Motion 4:13-15.

[35]    Plaintiffs object to Defendants' characterization of Gonzalez's arrest.  *See* Plaintiffs' Evidentiary Objections ¶¶ 49-52.  Plaintiffs' objections are **OVERRULED** because Plaintiffs fail to show a material dispute concerning Defendants' facts regarding Gonzalez's arrest.  Although Plaintiffs point to Macias's deposition testimony in which Macias he claimed that Plaintiffs' vehicle was parked prior to the traffic stop, there is no material dispute that Plaintiffs' front windshield was unlawfully tinted and that Gonzalez had an outstanding warrant.

[36]    Opposition 4:26-5:2.

[37]    *Id.* at 5:3-5.

[38]    *Id.* at 5:7-11.  Defendants object to Plaintiffs' claim that Valadez was informed by the District Attorney's Office that "no [*sic*] warrant existed."  *See* Defendants Evidentiary Objections ¶ 83.  Defendants' objection is **SUSTAINED** because Plaintiffs' evidence is inadmissible hearsay.  Furthermore, Plaintiffs completely misstate the evidence supporting their assertion, because, in the declaration that Plaintiffs cite, Valadez states "I called the District's Attorney's Office about the warrant that Deputies Ibarra and Marinelli told me they were attempting to serve on March 17, 2019.  I was told that there was warrant for Mr. Gonzalez at that time."  *See* Neal Declaration, Ex. 1 (Decl. of Pl. Anne Valadez in Supp. of the Opposition (the "Valadez Declaration")) [ECF No. 135-1] ¶ 10.  Although Valadez's phone call concerned a later incident with the LASD, Plaintiffs cite that paragraph in support of the January 22, 2019, incident.  *See* Plaintiffs' Statement of Facts ¶ 83.

of California law.[39]  The deputies requested Plaintiffs to lower their car windows, and Ibarra approached the vehicle with his firearm at his side.[40]  Valadez recorded the encounter on both her cell phone and her dashboard camera, and she became confrontational when Ibarra asked her to put her cell phone down.[41]  Ibarra informed Plaintiffs that they were pulled over because of their vehicle's broken license plate light and excessive window tint.[42]  Valadez responded that Plaintiffs had already received a fix-it ticket for those infractions.  Ibarra then asked for Valadez's driver license, registration, and insurance information.[43]

During the stop, Ibarra told Valadez that he smelled marijuana inside the vehicle.[44]  Valadez denied possessing or smoking marijuana, and she told Ibarra, "you can search me, I don't have weed."[45]  Although at some point Valadez denied consent for a search,[46] Valadez later confirmed that she did grant permission for Ibarra to search Plaintiffs' vehicle.[47]  Ibarra directed Valadez to step out of the car while he conducted the search.[48]  When Valadez resisted Ibarra's orders to exit the vehicle, Ibarra threatened to arrest her for delaying his investigation.[49]  Although Ibarra stated that he found a small amount of marijuana in Plaintiffs' vehicle, he did not issue a citation, nor did the deputies document

---

[39]     Defendants' Statement of Facts ¶ 55.  Plaintiffs object to that fact because it occurred at night, and Plaintiffs speculate whether Ibarra and Marinelli could see the vehicle code violations.  *See* Plaintiffs' Evidentiary Objections ¶ 55.  Plaintiffs' objection is **OVERRULED**.  Plaintiffs point to Ibarra's deposition testimony, but none of the cited evidence indicates that Defendants could not recognize a broken license plate *light* at night, or excessive window tint.

[40]     Defendants' Statement of Facts ¶ 59.  Plaintiffs object to that fact and claim that Valadez "saw the deputies point their gun directly at the occupants."  Plaintiffs' Evidentiary Objections ¶ 59.  Plaintiffs' objection is **OVERRULED** because Plaintiffs' evidence does not contradict Defendants' fact.  Furthermore, video evidence contradicts the objection:  Valadez asked Ibarra "why are you holding your gun like that?" and Ibarra responded, "because that's the way I hold it."  There is no evidence from the video or audio evidence that the firearm was pointed directly at Plaintiffs.  *See* Neal Declaration, Exs. M5 ("Exhibit M5") [ECF No. 135-34] & M6 ("Exhibit M6") [ECF No. 135-35] 00:20-30.

[41]     Defendants' Statement of Facts ¶¶ 61-63.  Plaintiffs' objections are **OVERRULED** because they do not dispute any material fact.  *See* Plaintiffs' Evidentiary Objections ¶¶ 61 & 63.

[42]     Exhibit M6 00:45-53.

[43]     *Id.*

[44]     Defendants' Statement of Facts ¶ 73; *see also* Neal Declaration, Ex. M7 ("Exhibit M7") [ECF No. 135-36] 02:35-40.

[45]     Exhibit M7 02:40-42.

[46]     *Id.* at 02:52-56.

[47]     *Id.* at 03:57-60.

[48]     *Id.* at 02:50-3:20.

[49]     *Id.* at 03:48-52.

the presence of any marijuana.[50]  When Ibarra questioned Valadez about the marijuana that he found in Plaintiffs' vehicle, Valadez responded that it did not belong to her.[51]

The deputies asked Gonzalez if he had any identification.  When Gonzalez responded that he did not, Marinelli pulled Gonzalez out of the vehicle, handcuffed him, and placed him in the back seat of the patrol car.[52]  In response to Valadez's request for a supervisor, Sergeant Richard Alvarez arrived at the scene and provided his business card to Valadez so that she could file a complaint.[53]  Also at Valadez's request, paramedics arrived on scene at around 1:45 a.m. to address her complaints of anxiety.[54]  Valadez claimed that when she tried to make a formal complaint, Alvarez told her that if she made such a complaint, then he would arrest her for striking an officer.[55]

### 6.    June 8, 2019

On June 8, 2019, at around 11:40 p.m.—a few months after the previous incident—Gonzalez was performing maintenance on a vehicle in front of Plaintiffs' driveway.  Valadez was sitting in the front seat of that car.[56]  Deputies Jaime Gomez and Guillermo Alvarez, Jr. were on patrol in Plaintiffs' neighborhood.  The deputies claim that they observed Gonzalez duck his head twice, as if to avoid being seen.[57]  Gomez and Alvarez, Jr.[58] asserted that Gonzalez's actions suggested to them that Gonzalez may have been in the process of stealing the vehicle, and, accordingly, they stopped to investigate.[59]  Alvarez, Jr. detained Gonzalez and placed him in the back seat of the patrol car, while

---

[50]    Defendants' Statement of Facts ¶ 84.

[51]    Plaintiffs' Statement of Facts ¶¶ 130 & 131.

[52]    *Id.* at ¶¶ 103-105.

[53]    Defendants' Statement of Facts ¶¶ 67 & 85.

[54]    *Id.* at ¶¶ 66 & 86.

[55]    Plaintiffs' Statement of Facts ¶ 142.  Plaintiffs also make several allegations regarding prior misconduct by Alvarez, Jr. and Marinelli.

[56]    Defendants' Statement of Facts ¶¶ 92-93.

[57]    *Id.* at ¶ 94.  Plaintiffs object to that fact, but their objection is **OVERRULED** because nothing in the record to which Plaintiffs cite contradicts the observations of Gomez and Alvarez, Jr.  *See* Plaintiffs' Evidentiary Objections ¶ 94.  While Gonzalez may not have ducked his head, and instead may have made such movements while conducting vehicle maintenance, it does not negate the testimony that Defendants cite.

[58]    The Court refers to Defendant Deputy Guillermo Alvarez, Jr. as "Alvarez, Jr." to distinguish him from Defendant Sergeant Richard Alvarez.

[59]    Defendants' Statement of Facts ¶ 95.  Plaintiffs object that the deputies' stop was pretextual, but their objection is **OVERRULED** because the video evidence that Plaintiffs cite does not suggest that the stop was pretextual.  *See* Plaintiffs' Evidentiary Objections ¶ 95.

Gomez asked Valadez for identification.[60]  Valadez told Gomez that she did not have identification on her person, and Gomez asked her to exit the vehicle.[61]

Gomez and Valadez began to argue over whether the deputies needed Valadez's identification and whether the deputies could look up her information in the police database.[62]  Alvarez, Jr. ran the vehicle's license plate to identify its owner, and Gomez asked Valadez for her name.[63]  Valadez initially provided her name to Gomez, but later she refused to disclose it again when Gomez asked.  Gomez then searched inside the vehicle for other evidence to confirm its ownership.[64]

After concluding the investigation, Gomez closed the driver-side door of the vehicle in which Valadez was sitting, which was obstructing the patrol vehicle's rear door.[65]  When Gomez shut Valadez's driver-side door, the door struck Valadez's hand.[66]  The deputies departed without arresting or citing either Plaintiff.[67]

Valadez then called the LASD Century Station and requested that a supervisor respond to the scene.[68]  Sergeants Richard Alvarez and Andrea Varela met Valadez at Plaintiffs' residence, and Valadez made a complaint concerning her interactions with Gomez and Alvarez, Jr.[69]  Valadez requested medical aid for her injured hand, and paramedics responded to the scene shortly thereafter.[70]

Later that week, Valadez appeared at the Century Station to file a written complaint regarding her interaction with Gomez and Alvarez, Jr., but Sergeant Adams refused the to take Valadez's complaint because Sergeants Alvarez and Varela had already determined that Valadez's grievance was unsubstantiated.[71]  Adams also told Valadez that although her complaint was forwarded to Chief Vera, that complaint was

---

[60]    Defendants' Statement of Facts ¶¶ 97 & 98; *see also* Exhibit M7.

[61]    Defendants' Statement of Facts ¶¶ 99 & 100; *see also* Exhibit M7.

[62]    Defendants' Statement of Facts ¶¶ 101, 106, & 107; *see also* Exhibit M7.

[63]    Defendants' Statement of Facts ¶¶ 106 & 107; *see also* Exhibit M7.

[64]    Defendants' Statement of Facts ¶¶ 107 & 108; *see also* Exhibit M7.

[65]    Defendants' Statement of Facts ¶ 112; Exhibit M7 8:09-8:11.

[66]    Defendants' Statement of Facts ¶ 113; Exhibit M7 8:09-8:11.

[67]    Defendants' Statement of Facts ¶ 114; *see also* Exhibit M7.

[68]    Plaintiffs' Statement of Facts ¶ 241.

[69]    *Id.* at ¶¶ 242 & 243.

[70]    *Id.* at ¶¶ 246-248.

[71]    *Id.* at ¶¶ 251 & 252.

also dismissed because Valadez had previously filed multiple unsubstantiated complaints that were dismissed.[72]

### 7.   March 31, 2020

More than nine months later, on March 31, 2020, at about 12:30 a.m., Valadez and Gonzalez were performing maintenance on a vehicle that was parked on the street outside of their residence.[73]  A friend of Plaintiffs had hired Gonzalez to fix the friend's car's gas pump, and that vehicle was parked under a pop-up canopy tent.[74]  Valadez had recently had surgery on her ankle, and she was seated in the vehicle's driver seat.[75]

Deputies John Hunziker and Eliezer Vera, Jr. were investigating reports of shots fired approximately one block from Plaintiffs' residence, and they were patrolling the neighborhood when they spotted Plaintiffs and the vehicle underneath the tent.[76]  The deputies claimed that they suspected that the vehicle was stolen, but that they were unable to run its license plate through the police database because the plate was obscured behind the tent and another car was parked closely behind it.[77]

The deputies approached Plaintiffs and asked them if they had heard any gun shots.  Valadez responded that she had not.[78]  The deputies then asked Valadez if she owned the vehicle.  She told them that the car belonged to a client, and the deputies requested paperwork to confirm that fact or the owner's name.[79]  Hunziker instructed Valadez to exit the vehicle, and Valadez responded that she had a fractured leg.[80]  Vera, Jr.[81] attempted to assist Valadez with exiting the vehicle; Valadez told him not to touch

---

[72]     *Id.* at ¶¶ 253-255.  Defendants object to Plaintiffs' Statement of Facts ¶ 257.  *See* Defendants' Evidentiary Objections ¶ 257.  Defendants' objection is **SUSTAINED**.  Although the video shows that a patrol vehicle was parked outside of Plaintiffs' residence on June 11, 2019, there is no audio or other indication that the deputies harassed Plaintiffs concerning Valadez's complaint.  *See* Neal Declaration, Ex. M14 [ECF No. 135-43] 1:09:30-1:10:30.  Additionally, Plaintiffs are unable to identify the deputies who allegedly harassed them.

[73]     Plaintiffs' Statement of Facts ¶ 272.

[74]     *Id.* at ¶¶ 273 & 277.

[75]     *Id.* at ¶¶ 275 & 278.

[76]     *Id.* at ¶¶ 284, 286, & 290.

[77]     Defendants' Statement of Facts ¶¶ 136 & 137.

[78]     Neal Declaration, Ex. M10 ("Exhibit 10") [ECF No. 135-39] 00:15-20.

[79]     *Id.* at 00:42-52.

[80]     *Id.* at 00:55-01:10.

[81]     The Court refers to Defendant Deputy Eliezer Vera, Jr. as "Vera, Jr." to distinguish him from Defendant Chief Eliezer Vera.

her.  Valadez then became agitated, and she told Vera, Jr. again that her leg was injured.[82] Vera, Jr. asked Valadez to put down her cellphone while she was exiting the vehicle, but Valadez refused.[83]

Vera, Jr. pulled Valadez from the vehicle, and he informed Valadez that she was being detained for impeding a stolen-vehicle investigation.[84]  Vera, Jr. placed Valadez's hands behind her back and pinned her against the vehicle.[85]  While Vera, Jr. was detaining Valadez, Valadez screamed at him.  Valadez repeatedly moved from side to side, and Hunziker instructed her to stop resisting.[86]  Vera, Jr. initiated a request for a female deputy to perform a protective pat-down search of Valadez, and he continued to hold Valadez's hands behind her back while he awaited assistance.[87]  Valadez remarked to Vera, Jr. that "she could feel his penis on her butt," and she asked him to stop.  Vera, Jr. provided Valadez more space, but he continued to detain her against the vehicle.[88]  Non-party Deputy Elise Medina arrived on the scene, and Vera, Jr. stepped away from Valadez so that Medina could perform a protective pat-down search of Valadez.[89]

Sergeant Micah Lopez then arrived on the scene, and it is disputed whether he offered to call paramedics for Valadez and whether Valadez refused the offer.[90]  Valadez claims that she requested Lopez to obtain medical assistance for her and that Lopez responded that he would check it out and see.  Valadez contends that paramedics never arrived.[91]  Lopez, in contrast, claims that he offered to call for medical attention for Valadez, but she refused.[92]

---

[82]   Exhibit 10 01:10-50.

[83]   *Id.*

[84]   *Id.* at 02:10-16.

[85]   Neal Declaration, Ex. M11 ("Exhibit M11") [ECF No. 135-40] 03:15-20.

[86]   Defendants' Statement of Facts ¶¶ 151 & 152.

[87]   *Id.* at ¶¶ 153 & 154.

[88]   Plaintiffs' Statement of Facts ¶¶ 322 & 325.

[89]   Defendants' Statement of Facts ¶ 160.

[90]   *Id.* at ¶ 163.

[91]   Plaintiffs' Statement of Facts ¶ 347.

[92]   Defendants' Statement of Facts ¶ 163.

Vera, Jr. issued a ticket to Valadez for working on a vehicle on a highway.[93]  While issuing the citation, Vera, Jr. ordered Valadez to place her thumbprint on the back of the citation.[94]

Valadez later filed a complaint against the deputies, and Sergeant Brian Anderson collected evidence to assist with the investigation into Valadez's allegations of misconduct.[95]  Lieutenant Dru Strong interviewed Plaintiffs and the deputies, and after reviewing surveillance footage and statements from Plaintiffs' neighbor, Strong determined that Valadez's complaint was unsubstantiated.[96]

## II.  LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  When deciding a motion for summary judgment, the court construes the evidence in the light most favorable to the non-moving party.  *See Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991).  However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).  The substantive law determines the facts that are material.  *See id.* at 248.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.*  Factual disputes that are "irrelevant or unnecessary" are not counted.  *Id.*  A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

Under that standard, the moving party has the initial burden of informing the court of the basis for its motion and identifying the portions of the pleadings and the record that it believes demonstrate the absence of an issue of material fact.  *See Celotex Corp. v.*

---

[93]     Plaintiffs' Statement of Facts ¶ 350.

[94]     *Id.* at ¶ 351.

[95]     Defendants' Statement of Facts ¶ 166 & 172.

[96]     *Id.* at ¶¶ 168, 169, & 172.  Defendants object to Plaintiffs' Statement of Facts ¶ 354, in which Plaintiffs claim that on April 10, 2020, Lieutenant De Bella "randomly left a blank Complaint form on the front door of Plaintiffs' residence.  To do so, [she] entered through the locked front gate of Plaintiffs' residence."  Defendants' objection is **SUSTAINED** because the evidence is inadmissible hearsay and Valadez's deposition testimony lacks a factual basis to support her conclusory statement that deputies forced their way through her locked front gate.  *See* Valadez Declaration ¶ 49.

-13-

*Catrett*, 477 U.S. 317, 323 (1986).  When the non-moving party bears the burden of proof at trial, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case.  *See id.* at 325.  Instead, the moving party need only prove that there is an absence of evidence to support the nonmoving party's case.  *See id.*; *Oracle Corp. Sec. Litig.*, 627 F.3d at 387.  The party seeking summary judgment must show that "under the governing law, there can be but one reasonable conclusion as to the verdict."  *Anderson*, 477 U.S. at 250.

If the moving party sustains its burden, the non-moving party must then show that there is a genuine issue of material fact that must be resolved at trial.  *See Celotex*, 477 U.S. at 324.  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson*, 477 U.S. at 248.  "This burden is not a light one.  The non-moving party must show more than the mere existence of a scintilla of evidence."  *Oracle Corp. Sec. Litig.*, 627 F.3d at 387 (citing *Anderson*, 477 U.S. at 252).  The non-moving party must make this showing on all matters placed at issue by the motion as to which it has the burden of proof at trial.  *See Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 252.

Furthermore, a party "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).  "The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated."  Advisory Committee Notes, 2010 Amendment, to Fed. R. Civ. P. 56.  Reports and declarations in support of an opposition to summary judgment may be considered only if they comply with Rule 56(c) of the Federal Rules of Civil Procedure, which requires that they "be made on personal knowledge, set forth facts that would be admissible evidence, and show affirmatively that the declarant is competent to testify to the matters stated therein." *Nadler v. Nature's Way Prod., LLC*, 2015 WL 12791504, at *1 (C.D. Cal. Jan. 30, 2015); *see also Loomis v. Cornish*, 836 F.3d 991, 996–97 (9th Cir. 2016) (noting that hearsay statements do not enter into the analysis on summary judgment).

## III.  ANALYSIS

### A.   Plaintiffs' Request for Judicial Notice

The court may take judicial notice of facts that either are "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b). The court cannot take judicial notice of facts that are subject to reasonable dispute.  *See Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001), *overruled on other grounds by*

*Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002); *see also Twombly*, 550 U.S. at 555 n.11.

Facts that are susceptible to judicial notice include "matters of public record." *Intri-Plex Techs., Inc. v. Crest Grp., Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007). In the Ninth Circuit, "court filings and other matters of public record" are sources whose accuracy cannot reasonably be questioned for the purposes of Rule 201 of the Federal Rules of Evidence. *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006). "The court . . . must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2).

The Ninth Circuit also applies the "incorporation by reference" doctrine. *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005). Under that doctrine, the court may "take into account documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading." *Id.* (internal citations and quotations omitted) (alteration in original).

Plaintiffs request that the Court take judicial notice of the following documents:[97]

- "50 Years of Deputy Gangs in the Los Angeles County Sheriff's Department";
- "Understanding Subgroups Within the Los Angeles County Sheriff Department"; and
- "County of Los Angeles' Report of the Citizen's Commission on Jail Violence, September 2012."

The first document is a study published by the Center for Juvenile Law and Policy at Loyola Law School.[98] Courts regularly hold that law review articles or publications are not "facts" for which judicial notice is proper. *See Lingad v. Indymac Fed. Bank*, 682 F. Supp. 2d 1142 (E.D. Cal. 2010) (denying judicial notice for a law review article); *In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d 903 (N.D. Cal. 2020) (denying judicial notice for two law review articles); *Emery v. Hunt,* 236 F. Supp. 2d 1033, 1041 (D.S.D. 2002) ("Judges do not take 'judicial notice' of federal laws, domestic session laws, domestic statutes, law review articles, or similar legal authorities."). Accordingly, Plaintiffs' request for judicial notice of that document is **DENIED**.

---

[97]    *See* Pls.' Request for Judicial Notice In Opp'n to Defs.' Mot. for Summ. J. ("RJN") (including its attachments) [ECF No. 137].

[98]    *Id.*, Ex. 20 [ECF No. 137-2] 2.

The second document was produced by Rand, a public policy think-tank.[99] Plaintiffs' request for judicial notice of that document is **DENIED** for similar reasons. Further, Plaintiffs do not identify the specific facts within that document of which they seek judicial notice, which is an additional ground for denial. *See Capaci v. Sports Rsch. Corp.*, 445 F. Supp. 3d 607, 617 (C.D. Cal. 2020) (denying judicial notice of studies when the requesting party "simply requests that the court take judicial notice of the documents in their entirety"). Because Plaintiffs do not identify the facts within those documents of which they ask the Court to take judicial notice, nor do Plaintiffs explain why the Court can judicially notice those facts, the Court **DENIES** Plaintiffs request for judicial notice for the first two documents.

Plaintiffs' request for judicial notice of the third document—the Report of the Citizen's Commission on Jail Violence—is **GRANTED**. That document is a public record published by the County of Los Angeles. Accordingly, judicial notice is proper under Rule 201(c)(2).

## B.      Plaintiffs' Claims for Relief

### 1.      Conspiracy

Defendants argue that Plaintiffs' conspiracy claim is barred both by law and for lack of evidentiary support. Additionally, even if evidence existed to support Plaintiffs' claim that LASD deputies conspired to harass and intimidate Plaintiffs, Defendants contend that Plaintiffs' conspiracy claim is barred by qualified immunity.[100] Defendants are correct.

#### a.      Intra-Corporate Conspiracy Doctrine

In order to allege a conspiracy under 42 U.S.C. § 1983, a plaintiff must show "an agreement or 'meeting of the minds' to violate constitutional rights." *Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002) (citing *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540-41 (9th Cir. 1989) (*en banc*)). "To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." *Id.* That agreement or meeting of the minds may be inferred on the basis of circumstantial evidence, such as the actions of the defendants. *See Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1301 (9th Cir. 1999). A showing that Defendants committed acts that "are unlikely to have been undertaken without an agreement" may support the inference of a conspiracy. *Id.* In addition, a conspiracy to violate constitutional rights must be predicated on a viable

---

[99]     *Id.*, Ex. 21 [ECF No. 137-3] 3.

[100]     Motion 10:20-12:27.

underlying constitutional claim. *See Thornton v. City of St. Helens*, 425 F.3d 1158, 1168 (9th Cir. 2005). The claim requires "an actual deprivation of constitutional rights." *Hart v. Parks*, 450 F.3d 1059, 1071 (9th Cir. 2006). "The defendants must have, by some concerted action, intended to accomplish some unlawful objective for the purpose of harming another which results in damage." *Mendocino Envtl. Ctr.*, 192 F.3d at 1301.

Defendants contend that Plaintiffs' § 1983 conspiracy claim is barred by the intra-corporate conspiracy doctrine.[101] Both sides cite numerous legal authorities in their respective papers that discuss the intra-corporate conspiracy doctrine within the context of another statue—42 U.S.C. § 1985(3)—which concerns a conspiracy by private individuals to deprive another of equal protection under the law. *See* 42 U.S.C. § 1985(3). Here, Plaintiffs assert their conspiracy claim not under § 1985(3)—but under § 1983— which allows an individual to sue local and state officials for a violation of the individual's constitutional rights. *See* 42 U.S.C. § 1983. The Ninth Circuit has held that "[a]n action under § 1985(3) alleging a conspiracy to deprive a person of constitutional rights is designed to remedy the same types of harms as the deprivations actionable under § 1983." *McDougal v. Cnty. of Imperial*, 942 F.2d 668, 673 (9th Cir. 1991). Because conspiracy claims under § 1983 and § 1985(3) are similarly construed, the Ninth Circuit characterizes both claims as personal injury actions and applies identical statutes of limitations. *See id.* at 674.

Because the Ninth Circuit holds that conspiracy claims under § 1983 and § 1985(3) are largely similar, it follows that authorities analyzing the intra-corporate conspiracy doctrine under § 1985(3) should similarly be applicable to § 1983 claims against state and local governments. The intra-corporate conspiracy doctrine provides that "as a matter of law, a corporation cannot conspire with its own employees or agents." *Hoefer v. Fluor Daniel, Inc.*, 92 F. Supp. 2d 1055, 1057 (C.D. Cal. 2000). The Supreme Court has explained the doctrine as follows:

> The rule is derived from the nature of the conspiracy prohibition. Conspiracy requires an agreement—and in particular an agreement to do an unlawful act—between or among two or more separate persons. When two agents of the same legal entity make an agreement in the course of their official duties, however, as a practical and legal matter their acts are attributed to their principal. And it then follows that there has not been an agreement between two or more separate people.

*Ziglar v. Abbasi*, 582 U.S. 120, 153 (2017). Put another way, there can be no conspiracy within a single organization, because its agents are like "a multiple team of horses

---

[101]     *Id.* at 10:21-24.

drawing a vehicle under the control of a single driver." *Copperweld Corp v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984).

Circuit courts are split regarding whether the intra-corporate conspiracy doctrine applies to government entities. The Supreme Court has acknowledged that circuit split and has explicitly deferred any ruling on the issue. *See Ziglar*, 582 U.S. at 153 ("Nothing in this opinion should be interpreted as either approving or disapproving the intracorporate-conspiracy doctrine's application in the context of an alleged § 1985(3) violation."). With respect to the instant Motion, the Ninth Circuit "has never directly addressed whether individual members of a single government entity can form a 'conspiracy' within the meaning of section 1985." *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 910 (9th Cir. 1993); *see, e.g.*, *Armstrong v. Reynolds*, 22 F.4th 1058, 1085 n.8 (9th Cir. 2022) ("[I]n the context of federal conspiracy claims, this court has expressly reserved the question 'whether individual members of a single government entity can form a "conspiracy" within the meaning of section 1985.'" (citing *Portman*)).

### b. Qualified Immunity

This Court need not decide whether the intra-corporate conspiracy doctrine reaches governmental entities, though, because Defendants prevail on their qualified immunity defense.[102] "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Taylor v. Barkes*, 575 U.S. 822, 825 (2015). Thus, a qualified-immunity analysis involves two separate steps: the court first determines whether the facts show that the officer's conduct violated a constitutional right; if so, the court must then determine whether that constitutional right was clearly established at time of the alleged unlawful action. *See id.*; *Hopkins v. Bonvicino*, 573 F.3d 752, 762 (9th Cir. 2009). "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Taylor*, 575 U.S. at 825 (brackets and internal quotation marks omitted). The law does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Officers who violate a clearly established constitutional right are not entitled to qualified immunity.

In *Ziglar*, the Supreme Court held that qualified immunity barred a plaintiff's conspiracy claim against the government because "the fact that the courts are divided as to whether or not a § 1985(3) conspiracy can arise from official discussions between or among agents of the same entity demonstrates that the law on the point is not well

---

[102]     *Id.* at 14:12-15:14.

established." *Ziglar*, 582 U.S. at 154.  Here, in view of intra-district splits and the Ninth Circuit's silence on the application of the intra-corporate conspiracy doctrine, "it would be 'unfair' to subject officers to damages liability when even 'judges . . . disagree.'" *Id.* (citing *Wilson v. Layne*, 526 U.S. 603, 618 (1999)).  Furthermore, as explained below, Plaintiffs' conspiracy claim will fail if Plaintiffs do not prevail on their constitutional-injury theories that serve as the basis for that claim.

### 2.  Excessive Force and Denial of Medical Care

Plaintiffs include both of those theories in their Second Claim for Relief.[103]  The Court analyzes each separately.

### a.  Excessive Force

Plaintiffs detail several separate instances in which LASD deputies allegedly used excessive force when interacting with or detaining Plaintiffs.  In response, Defendants maintain that the deputies did not use excessive force during their interactions with Plaintiffs or, in the alternative, that qualified immunity bars Plaintiffs' excessive force claim.

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force."  *Graham v. Connor*, 490 U.S. 386, 394 (1989).  "Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person."  *Id.*  "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."  *Id.* at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).

The Ninth Circuit's test for assessing the objective reasonableness of a particular use of force considers:  "(1) the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted, (2) the government's interest in the use of force, and (3) the balance between the gravity of the intrusion on the individual and the government's need for that intrusion."  *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017) (*en banc*) (quoting *Glenn v. Washington County*, 673 F.3d 864, 871 (9th Cir. 2011)) (internal quotation marks omitted).  "This standard requires the court to 'judge the reasonableness of a particular use of force from

---

[103]      *See* Amended Complaint ¶¶ 110-124.

the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Ballew v. City of Pasadena*, 2022 WL 17974488, at *13 (C.D. Cal. Nov. 23, 2022) (quoting *Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

### i.     March 17, 2019, Incident

Proceeding chronologically through Plaintiffs' Amended Complaint, the first alleged incident of excessive force stems from the actions of Deputies Ibarra and Marinelli on March 17, 2019.  During that traffic stop, Plaintiffs claim that the deputies approached Plaintiffs' vehicle with their firearms drawn and that Ibarra "attempted to smack [Valadez's] phone out of her hand."[104]

### (a)     Traffic Stop

Under the Fourth Amendment, a seizure for a traffic stop is "a relatively brief encounter" "more analogous to a so-called *Terry* stop than to a formal arrest." *United States v. Taylor*, 60 F.4th 1233, 1239 (9th Cir. 2023) (citing *Rodriguez v. United States*, 575 U.S. 348, 354 (2015), and referring to *Terry v. Ohio*, 392 U.S. 1 (1968)).  "To be lawful, a traffic stop must be limited in its scope:  an officer may 'address the traffic violation that warranted the stop,' make 'ordinary inquiries incident to the traffic stop,' and 'attend to related safety concerns.'" *Id.*  "The stop may last 'no longer than is necessary to effectuate' these purposes and complete the traffic 'mission' safely." *Id.* (internal citations omitted).  However, a stop "may be extended to conduct an investigation into matters other than the original traffic violation" so long as "the officers have reasonable suspicion of an independent offense." *United States v. Landeros*, 913 F.3d 862, 867 (9th Cir. 2019).

Here, there is no genuine dispute that Ibarra and Marinelli had a legitimate reason for stopping Plaintiffs' vehicle, which had a broken license plate light and excessive window tint, in violation of Cal. Veh. Code §§ 24601 and 26708(a)(1), respectively.[105]  Although the degree to which the deputies either drew their weapons, or aimed them at Plaintiffs, during the stop is disputed,[106] resolving those disputes in favor of Plaintiffs still

---

[104]     *Id.* at ¶ 112.

[105]     Defendants' Statement of Facts ¶ 55.

[106]     Plaintiffs allege that Marinelli pointed his weapon inside of the vehicle when he opened the passenger door.  *See* Plaintiffs' Statement of Facts ¶ 92.

yields the conclusion that the deputies' actions were reasonable under the circumstances. The vehicle stop was effected at night and in a high-crime area,[107] and the deputies were unable to see inside the vehicle due to its window tint.[108]

Furthermore, video and audio of the traffic stop show that the deputies did not unreasonably brandish their firearms nor otherwise threaten Plaintiffs.[109] "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). When video of an incident exists, courts are directed to view the factual record "in the light depicted by the videotape." *Id.* at 381. Here, Valadez calmly asked, "why are you holding your gun like that," and the deputy responded, "because that's how I hold it."[110] There is no indication from the video or audio that the officers acted unreasonably under the circumstances nor that Plaintiffs were unduly threatened by the deputies' actions.

Additionally, the Ninth Circuit has affirmed district courts that found no constitutional violation when police officers drew their weapons during traffic stops at night. In *Deskins v. City of Bremerton*, 2009 WL 1247067 (W.D. Wash. May 4, 2009), *aff'd*, 388 F. App'x 750 (9th Cir. 2010), a state trooper pointed her firearm directly at a driver during a traffic stop at night. *See id.* at *7. The district court concluded that the trooper reasonably feared for her safety, as the traffic stop occurred on an unlight highway at night, and the trooper could not tell whether the driver was armed. *See id.* Because the trooper acted reasonably under the totality of the circumstances, the district court dismissed the plaintiff's excessive force claims on summary judgment. *See id.*

Similar to the trooper in *Deskins*, the deputies here acted reasonably when drawing their weapons as they initiated the traffic stop. The deputies could not see inside the tinted windows of Plaintiffs' vehicle, and the traffic stop occurred at night in a high-crime neighborhood. Furthermore, Defendants' qualified immunity defense would bar Plaintiffs' claim for excessive force in that instance, because even if the deputies exercised excessive force by drawing their weapons while conducting the traffic stop, there is no clearly established case law that the deputies violated. *See Taylor*, 575 U.S. at 825.

---

[107]   Defendants' Statement of Facts ¶ 3.

[108]   *Id.* at ¶ 57. Plaintiffs' objection is **OVERRULED** because there is no factual dispute regarding whether Valadez eventually "rolled her window down." *See* Plaintiffs' Evidentiary Objections ¶ 57.

[109]   Exhibit M6 00:20-30.

[110]   *Id.*

Plaintiffs' citation to *Washington v. Lambert*, 98 F.3d 1181 (9th Cir. 1996), does not refute the Court's finding of qualified immunity, because in *Washington* the police officers conducted an egregious *Terry* stop without probable cause. *See id.* at 1194 ("[I]t would be a sad day for the United States if two African–American men who only *somewhat* resemble a *very general* description of men suspected of robberies in the same *general* area of a major metropolis can for that reason alone be subjected to the terrifying and humiliating experience that [the plaintiffs] endured.") (emphasis in original).

### (b)   Cellphone Incident

Valadez also claims that Ibarra used excessive force when he allegedly slapped her cellphone while she was recording her interaction with the deputies.  As an initial observation with respect to this legal contention, both parties cite unpublished and non-citable authorities.  *See Legaspi v. City of La Verne*, 2020 WL 5057345 (Cal. Ct. App. Aug. 27, 2020) (unpublished/non-citable); *Adkins v. Limtiaco*, 537 F. App'x 721 (9th Cir. 2013) ("This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36–3.").

California law assigns criminal liability for "[e]very person who willfully resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician . . . in the discharge or attempt to discharge any duty of his or her office or employment[.]"  Cal. Penal Code § 148(a)(1).  However, that statute also provides that "[t]he fact that a person takes a photograph or makes an audio or video recording of a public officer or peace officer . . . does not constitute, in and of itself, a violation of subdivision (a), nor does it constitute reasonable suspicion to detain the person or probable cause to arrest the person."  Cal. Penal Code § 148(g).

Here, video evidence shows that Ibarra ordered Valadez to put down her cellphone during an authorized traffic stop.[111]  Ibarra clearly did not succeed in slapping Valadez's cellphone out of her hand, because she continued to film the interaction.  Furthermore, Ibarra informed Valadez that she was delaying his investigation during the traffic stop and that her conduct violated Cal. Penal Code § 148 because she was resisting his orders while she continued to film the interaction.  In similar circumstances, the Ninth Circuit has affirmed a district court that concluded that a police defendant did not use excessive force when dealing with a non-compliant plaintiff during a lawful traffic stop.  *See Donovan v. Phillips*, 2015 WL 993324 (N.D. Cal. Mar. 4, 2015), *aff'd*, 685 F. App'x 611 (9th Cir. 2017) ("Plaintiff had no constitutional right, and certainly no clearly established one, to disregard Defendant's lawful orders or to do so without the consequence of arrest under these circumstances."); *see also Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1169-70 (9th

---

[111]     Exhibit M5 0:13-0:18.

Cir. 2011) (holding that minimal intrusions upon a driver's liberty interests during a lawful traffic stop were outweighed by "the important 'value of giving officers control over the movement of people involved in a traffic stop [in order to] limit[] the risk of danger to the police'") (internal citations and quotations omitted) (alterations in original).

Additionally, under the Fourth Amendment, it is not clearly established that Ibarra's conduct was prohibited; therefore, qualified immunity bars Valadez's claim. *See Mullenix v. Luna*, 577 U.S. 7, 19 (2015) (reversing the appellate court's denial of qualified immunity for an excessive force claim because the constitutional rule was not "beyond debate"). Accordingly, Valadez's claims for excessive force fail with respect to the traffic stop on March 17, 2019.

### ii.  June 8, 2019, Incident

Plaintiffs claim that Deputy Gomez used excessive force against Valadez during an investigatory stop, when Gomez struck Valadez with a vehicle door. Although it is disputed by the parties whether Gomez's actions were intentional, video of the incident clearly shows that Gomez did not intentionally strike Valadez with the door.[112] Gomez closed Valadez's door in an attempt to allow Gonzalez to exit the patrol vehicle through the rear passenger door closest to where Gonzalez was sitting, and Gomez inadvertently struck Valadez with the car door in the process.[113]

Both Plaintiffs offered declarations averring that the deputies did not need to close Valadez's door to allow Gonzalez to exit the patrol vehicle, but neither declaration refutes the clear video evidence. Ibarra had initially detained Gonzalez during the investigatory stop and had placed him into the patrol vehicle through the door on the opposite side of Valadez.[114] The declarations also fail to create a genuine dispute of material fact regarding intentionality, because each declaration merely speculates that there may have been enough room to allow Gonzalez to exit the patrol vehicle without closing Valadez's door.[115] Neither declaration states that Gonzalez was placed inside the patrol vehicle through the driver-side rear door, which was closest to Valadez. Further, because those declarations merely state conclusions instead of facts, they do not provide admissible evidence, and they cannot create a factual dispute. *See Nigro*, 784 F.3d at 497.

---

[112]   Neal Declaration, Ex. M9 ("Exhibit M9") [ECF No. 135-38] 08:09-12.

[113]   *Id.*

[114]   The video does not show Ibarra opening the patrol vehicle door nearest Valadez. *See* Exhibit M9.

[115]   *See* Valadez Declaration ¶ 20; Neal Declaration, Ex. 3 [ECF No. 135-3] ¶ 23.

For a claim of either excessive force or an intentional seizure under the Fourth Amendment, the actions taken by law enforcement must be intentional. *See Brower v. Cnty. of Inyo*, 489 U.S. 593, 597 (1989) (Fourth Amendment seizures occur "only when there is a governmental termination of freedom of movement *through means intentionally applied*") (emphasis in original); *see also Dimmig v. Pima Cnty.*, 2012 WL 1067963, at *4 (D. Ariz. Mar. 29, 2012), *aff'd sub nom. Dimmig v. Cnty. of Pima*, 569 F. App'x 540 (9th Cir. 2014) (holding that because a police officer made a reasonable mistake by running over the plaintiff with his patrol vehicle, "there cannot be liability under the Fourth Amendment"). Because there is no genuine dispute of fact regarding whether Ibarra's actions were unintentional, Plaintiffs cannot prevail on their excessive force claim for the June 8, 2019, incident. Even if unintentional actions could sustain Plaintiffs' Fourth Amendment claim, that claim would still be barred by Defendants' qualified immunity defense. *See Brower*, 489 U.S. at 597; *Dimmig*, 2012 WL 1067963, at *4.

### iii.   March 31, 2020, Incident

Plaintiffs claim that Deputies Vera, Jr. and Hunziker exercised excessive force during an investigatory stop on March 21, 2020. In that instance, Vera, Jr. and Hunziker had probable cause to investigate vehicular theft, because Plaintiffs were performing maintenance on a friend's vehicle under a tent at 12:30 a.m. Tools and car parts were scattered about the vehicle.[116] Moreover, the deputies could not run the license plate in their system because the plate was obscured by the tent; therefore, the deputies needed to question Plaintiffs to confirm the ownership of the vehicle. *See Rohde v. City of Roseburg*, 137 F.3d 1142, 1144 (9th Cir. 1998) (finding probable cause for arresting a driver suspected of vehicle theft due to the lack of registration and title, as well as information that the vehicle was stolen).

Video evidence of the interaction contradicts Plaintiffs' allegations that "Vera [, Jr.] violently and abruptly pulled Valadez out of the car."[117] Instead, the video shows that Vera, Jr. repeatedly asked Valadez to exit the vehicle and offered his assistance to help her to do so.[118] Because Valadez did not willingly exit the vehicle, or she was unable to do so without assistance because of her injured leg, it was reasonable for Vera, Jr. to use minimal force in removing Valadez from the vehicle. *See Lawrence v. City & Cnty. of San Francisco*, 258 F. Supp. 3d 977, 992 (N.D. Cal. 2017) (concluding that summary judgment was appropriate when law enforcement used reasonable force to extract the plaintiff from a vehicle when he was "unable or refused to exit the patrol vehicle"). Additional video

---

[116]   Defendants' Statement of Facts ¶ 134.

[117]   Opposition 23:4.

[118]   Exhibit M10 00:55-01:27.

from the neighbor's surveillance camera similarly supports the conclusion that Vera, Jr. did not use unreasonable force while extracting Valadez from the vehicle.[119]

The video shows that after Vera, Jr. removed Valadez from the vehicle, Valadez began to resist her detention physically by jerking her body back and forth.[120]   Although Valadez testified that Vera, Jr. then sexually assaulted her by "pressing his erect penis against her butt,"[121] her declaration and deposition testimony do not create a factual dispute when they are refuted by video evidence.   *See Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").   The video shows that Valadez was twisting her body against Vera, Jr. while resisting detention; it provides no evidence of any sexual assault.[122]   While Valadez was wrestling against Vera, Jr., he was wearing his department-issued duty belt, which included a baton and pepper spray.[123]

Furthermore, Valadez admits that when she informed Vera, Jr. that she could "feel his dick on [her] butt" and demanded that he stop, Vera, Jr. backed away to give her space, further supporting the fact that Vera, Jr. did not commit an intentional act nor engage in sexual assault.[124]   Vera, Jr.'s detention of Valadez ended when a female deputy arrived on scene to conduct a protective pat-down search.[125]   Plaintiffs' claims against Hunziker are similarly dismissed, because, without an underlying constitutional violation, there can be no liability for failure to intervene.[126]   Additionally, there is no evidence that Hunziker used excessive force by allegedly slapping Valadez's cellphone out of her hand, because surveillance footage shows that Valadez dropped her cellphone while Vera, Jr. was detaining her.[127]

### b. Denial of Medical Care

In their Opposition, Plaintiffs abandon their claims for denial of medical care against Deputies Ibarra and Marinelli and Sergeant Alvarez, but Defendants maintain that

---

[119]   Exhibit M11 03:05-15.

[120]   *Id.* at 03:15-35.

[121]   Opposition 23:26-27; Plaintiffs' Statement of Facts ¶¶ 320-322.

[122]   *See generally* Exhibit M10; Exhibit M11.

[123]   Defendants' Statement of Facts ¶ 158.

[124]   Exhibit 2 209:18-22.

[125]   Defendants' Statement of Facts ¶ 160.

[126]   Opposition 24:14-15.

[127]   Exhibit M11 03:25-35 & 7:25-38.

Sergeant Lopez and Deputies Vera, Jr. and Hunziker denied Valadez medical care in connection with the March 31, 2020, investigatory stop.[128]  The Ninth Circuit "requires that police officers seek the necessary medical attention for a detainee when he or she has been injured while being apprehended by either promptly summoning the necessary medical help or by taking the injured detainee to a hospital." *Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090, 1099 (9th Cir. 2006) (citing *Maddox v. City of Los Angeles*, 792 F.2d 1408, 1415 (9th Cir. 1986)).  Although the Ninth Circuit has not clearly defined what constitutes objectively reasonable medical care, "a police officer who promptly summons the necessary medical assistance has acted reasonably for purposes of the Fourth Amendment." *Id.*

Although the parties debate whether medical care is required for ***detainees*** under the Fourth Amendment—as opposed to individuals who are formally arrested, *see United States v. Del Vizo*, 918 F.2d 821, 824 (9th Cir.1990) ("There has been an arrest if, under the circumstances, a reasonable person would conclude that he was not free to leave after brief questioning.")—the Court need not decide whether Valadez's detention was sufficiently severe to require medical assistance.  The video footage establishes that at no point during Valadez's interaction with Vera, Jr. or Hunziker did Valadez sustain an injury sufficient to require medical assistance.[129]  Although Plaintiffs cite two legal authorities for their contention that Valadez was owed medical care for her panic attack, both cases concern prisoners within the Eighth Amendment context.[130]  *See Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175 (9th Cir. 2002), *overruled by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (holding that a prison's failure to provide competent medical staff to deal with its prisoners' medical and psychiatric needs constituted deliberate indifference under the Eighth Amendment); *Birch v. Gonzalez*, 2013 WL 1191429 (C.D. Cal. Feb. 15, 2013), *report and recommendation adopted*, 2013 WL 1191406 (C.D. Cal. Mar. 20, 2013) (dismissing a prisoner's Eighth Amendment claim for delayed treatment of mental health issues).

To the contrary, video footage of Valadez's interaction with Vera, Jr. and Hunziker shows that neither her panic attack nor her preexisting leg injury rises to the level of a Fourth Amendment violation.  In *D'Braunstein v. Durazo*, 2022 WL 656117 (C.D. Cal. Feb. 18, 2022), a court in this district analyzed the issue of when injuries sustained by a plaintiff rise to the level of a Fourth Amendment violation when the plaintiff is denied medical care.  In that case, the police arrested the plaintiff after he caused a single-vehicle crash and incurred serious damage to his vehicle.  *See id.* at *1.

---

[128]     Opposition 25 n.3.

[129]     *See generally* Exhibit M10; Exhibit M11.

[130]     Opposition 26:2-5.

The plaintiff exhibited "dry mouth, slurred speech, profuse sweating, confusion, poor balance, slow reaction time, spontaneous statements, and constricted pupils," and he was later determined to have suffered a stroke. *See id.* The *D'Braunstein* court analyzed the plaintiff's claim under the Fourth Amendment because the plaintiff was a post-arrestee who was never formally detained in prison. *See id.* at *5. The court compared the plaintiff's circumstances with Ninth Circuit authorities holding that "suspects have a Fourth Amendment right to 'objectively reasonable post-arrest [medical] care' until the end of the seizure." *See Est. of Cornejo* ex rel. *Solis v. City of Los Angeles*, 618 F. App'x 917, 920 (9th Cir. 2015) (citing *Tatum*, 441 F.3d at 1099). The *D'Braunstein* court denied the plaintiff's claim on summary judgment in view of the defendant's qualified immunity defense because the plaintiff had not "sustained patently obvious injuries" that required medical care. *Id.* at *6.

Here, Valadez's claimed injuries were far less severe than a stroke—as in *D'Braunstein* or *Cornejo*—or a drug overdose—as in *Tatum*. Despite Valadez's claim that she suffered a panic attack, the video shows that Valadez was responsive and argumentative with Vera, Jr. throughout her detainment.[131] Although Valadez was recovering from surgery on her leg, the record is devoid of any evidence or testimony that she suffered any significant injury from the incident.[132] Moreover, to the extent that Valadez does have a cognizable claim for denial of medical care under the Fourth Amendment, Defendants' qualified immunity defense prevails, in view of the lack of clearly established law on the matter. *See Taylor*, 575 U.S. at 825.

### 3.  Unlawful Search and Seizure

#### a.  December 27, 2018, Incident

Plaintiffs contend that Defendants conducted an unlawful search of Plaintiffs' property when Deputies Hernandez and Macias entered through Plaintiffs' gate on December 27, 2018. Plaintiffs also maintain that Valadez was unlawfully seized and placed in handcuffs during that incident. Plaintiffs' claim hinges on whether the deputies unlawfully entered the curtilage of Plaintiffs' residence, which is partially defined by the Ninth Circuit as "the steps taken by the resident to protect the area from observation by people passing by." *United States v. Perea-Rey*, 680 F.3d 1179, 1184 (9th Cir. 2012) (citing *United States v. Dunn*, 480 U.S. 294, 307 (1987)).

Although it is "permissible for officers to approach a home to contact the inhabitants," "[t]he constitutionality of such entries into the curtilage hinges on whether

---

[131]     *See generally* Exhibit M11.

[132]     Plaintiffs' Statement of Facts ¶ 345.

the officer's actions are consistent with an attempt to initiate consensual contact with the occupants of the home." *Id.* at 1187-88.  At issue here is a police encounter known as a "knock and talk."  "Officers conducting a knock and talk also need not approach only a specific door if there are multiple doors accessible to the public."  *Id.* at 1188.  During that type of visit, officers "may approach any part of the building . . . where uninvited visitors could be expected."  *Id.* (citation and quotation omitted).  "However, once an attempt to initiate a consensual encounter with the occupants of a home fails, 'the officers should end the knock and talk and change their strategy by retreating cautiously, seeking a search warrant, or conducting further surveillance.'"  *Id.* (citing *United States v. Troop*, 514 F.3d 405, 410 (5th Cir. 2008)).

Here, Hernandez and Macias did not violate Plaintiffs' Fourth Amendment rights by entering the curtilage of Plaintiffs' property while escorting Zavala as he attempted to serve a document on Gonzalez.  The deputies were videoed leaving Plaintiffs' property after unsuccessfully attempting to contact Gonzalez.[133]  Valadez alleges that a genuine dispute of fact exists regarding whether the deputies unlawfully unlocked Plaintiffs' iron gate, which was topped with metal spikes intended to deter trespassers, but Valadez's evidence is insufficient for a reasonable jury to find in her favor.  Valadez testified during her deposition that she locked Plaintiffs' gate, but the video does not show any sign of forced entry by Defendants, and Valadez conceded in her deposition that she did not recall how she locked Plaintiffs' gate, or even what the mechanism was for locking it.[134]  Even if Plaintiffs could prove that the gate was locked before Hernandez and Macias entered, their claim would still be barred by Defendants' qualified immunity defense in view of the absence of clear case law on the matter.  *See Azevedo v. City of Fresno*, 2010 WL 2353526 at *7 (E.D. Cal. June 9, 2010), *corrected*, 2010 WL 2599007 (E.D. Cal. June 18, 2010) (finding no Fourth Amendment violation when officers entered a curtilage that included a "locked" iron fence that was as high as "local city Ordinance allow[ed]" and that included a "beware of dog" sign).

Valadez also asserts that she was unreasonably seized when the deputies handcuffed her during the interaction, which stemmed from her violation of Cal. Veh. Code § 23123 by using a cellphone while she was driving.  There is no dispute of fact, because the video shows the deputies admonishing Valadez for her violation and warning her that she was being issued a citation.[135]  Valadez claims that those facts are

---

[133]     Exhibit M2 00:00-05.

[134]     Exhibit 2 125:12-25.

[135]     Exhibit M2 00:20-30 & 01:25-30.

disputed, and she contends that her conduct "did not obstruct the deputies' purported investigation" and that there was no need to handcuff her for a minor traffic violation.[136]

An ulterior motive cannot "invalidate police conduct justified on the basis of probable cause," though, and "[s]ubjective intentions play no role in the ordinary, probable-cause Fourth Amendment Analysis." *Whren v. United States*, 517 U.S. 806 (1996) (internal citation omitted). Further, the deputies were justified in handcuffing Valadez because California courts have found that handcuffing a person is reasonably justified by the "need of a reasonably prudent officer to protect himself and others." *Venegas v. County of Los Angeles*, 153 Cal. App. 4th 1230, 1248 (2007). Here, Valadez became agitated by the deputies' activities, and she declared that she regarded their presence "as a threat."[137] Accordingly, handcuffing Valadez during the interaction was justified.

### b.    January 22, 2019, Incident

Plaintiffs claim that Deputy Macias unlawfully arrested Gonzalez on January 22, 2019, and that disputed facts regarding the arrest preclude summary judgment.[138] Plaintiffs dispute facts offered by Defendants that Macias stopped Gonzalez for excessive window tint on Plaintiffs' vehicle and that they then arrested Gonzalez when they discovered that he was subject to an outstanding warrant.[139] As a threshold matter, Plaintiffs have not produced evidence or testimony that the warrant for Gonzalez's arrest did not exist. Indeed, in her declaration, Valadez testifies as follows:

> I called the District's Attorney's Office about the warrant that Deputies Ibarra and Marinelli told me they were attempting to serve on March 17, 2019. ***I was told that there was warrant for Mr. Gonzalez at that time.***[140]

Even if Valadez's declaration stated the opposite, it would still be a "self-serving declaration that states only conclusions and not facts that would be admissible evidence," and, as such, it would not provide admissible evidence. *See Nigro*, 784 F.3d at 497. Although Plaintiffs allege that Macias stopped Gonzalez without reasonable suspicion, the arrest would still be lawful under the Fourth Amendment in view of Gonzalez's outstanding warrant. *See Utah v. Strieff*, 579 U.S. 232, 239 (2016) (holding that a valid, pre-existing warrant justified the arrest and search of a

---

[136]    Opposition 30:16-22.

[137]    Exhibit M2 at 00:50-53.

[138]    Opposition 31:10-22.

[139]    *Id.*

[140]    Valadez Declaration ¶ 10 (emphasis added).

suspect, despite a prior unlawful search and seizure); *United States v. Hylton*, 30 F.4th 842 (9th Cir.), *cert. denied*, 143 S. Ct. 393 (2022) (finding that officers "did not need independent reasonable suspicion to perform the criminal history check").

   c.  **March 17, 2019, Incident**

   Plaintiffs allege that Deputies Ibarra and Marinelli performed an illegal search on March 17, 2019, when the deputies stopped Plaintiffs' vehicle on the basis of a broken license plate light and excessive window tint. Although a dispute exists regarding whether Ibarra smelled marijuana in the vehicle to justify the search, the video evidence undisputedly shows that Valadez repeatedly gave Ibarra verbal permission to search Plaintiffs' vehicle.[141] Valadez's Fourth Amendment claim fails here due to that consent. *See United States v. Cannon*, 29 F.3d 472, 477 (9th Cir. 1994) ("Failure to object to the continuation of a vehicle search after giving general consent to search is properly considered as an indication that the search was within the scope of the initial consent.") (citation omitted).

   In their Opposition, Plaintiffs make the conclusory argument that "a reasonable juror could infer that any consent provided by Valadez was given under duress."[142] However, that assertion is refuted by the video evidence, which shows that Valadez maintained a confrontational demeanor with the deputies while she continued to record the encounter.[143] "Voluntariness is a question of fact to be determined from the totality of the circumstances." *Id.* The record contains no indication that Valadez was coerced into consenting to the search, and, although Ibarra threatened to arrest Valadez for delaying his investigation, Ibarra did so in response to Valadez's combative attitude while she recorded the interaction—not in connection with Ibarra's requests to search the vehicle.[144]

   d.  **June 8, 2019, Incident**

   Plaintiffs claim that Deputies Gomez and Alvarez, Jr. conducted an illegal search of Plaintiffs' persons and vehicle on the night of June 8, 2019, while Plaintiffs were performing maintenance on a friend's car outside of Plaintiffs' driveway.

---

[141]  Exhibit M7 02:40-42 & 03:57-60.

[142]  Opposition 32:15-16.

[143]  *See generally* Exhibit M5; Exhibit M6; Exhibit M7; Neal Declaration, Ex. M8 [ECF No. 135-37].

[144]  Exhibit M5 00:18-26.

With respect to *Terry* stops and investigations, the Ninth Circuit instructs that "'[a]rticulating precisely what 'reasonable suspicion' and 'probable cause' mean is not possible. They are commonsense, nontechnical conceptions that deal with 'the factual and practical considerations of everyday life on which reasonable prudent men, not legal technicians, act.'" *United States v. Willy*, 40 F.4th 1074, 1080 (9th Cir. 2022) (citing *Ornelas v. United States*, 517 U.S. 690, 695 (1996)). A court "must 'examine whether the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person to believe a suspect has committed, is committing, or is about to commit a crime.'" *Id.* (citing *United States v. Valencia*, 24 F.3d 1106, 1108 (9th Cir. 1994)). There is no precise test, but the "probable cause" required for arrest is a higher standard than "reasonable suspicion" required for *Terry* stops and making further inquiries. *See Kansas v. Glover*, 140 S. Ct. 1183, 1187-88 (2020).

Here, the deputies had reasonable suspicion for conducting an investigatory stop. Plaintiffs were performing vehicle maintenance at night, in a high-crime area known for vehicle thefts. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (holding that the crime-related characteristics of a particular area may factor into a *Terry* analysis and further investigation). Further, the vehicle was parked in violation of Cal. Veh. Code § 22500(e)(1), because it was blocking Plaintiffs' driveway. *See United States v. Pearson*, 2017 WL 1628397 (C.D. Cal. Apr. 28, 2017) (stating that blocking a private driveway while parked on a public highway constitutes both a violation of Cal. Veh. Code § 22500(e)(1) and grounds for reasonable suspicion).

When the deputies questioned Valadez concerning Plaintiffs' ownership of the vehicle, Valadez did not have identification, and she would not provide her name.[145] The deputies then searched the vehicle for proof of ownership, and they located the vehicle registration in an envelope in the side of the door.[146] Although Plaintiffs allege that the deputies violated Gonzalez's right to be free from an unlawful search when the deputies removed everything from Gonzalez's pockets, the search was lawful because Gonzalez was on probation at the time of the incident, and he was, therefore, subject to search. *See United States v. Knights*, 534 U.S. 112, 121 (2001) ("When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable."). Additionally, the deputies were unaware whether Gonzalez was armed, so, under the circumstances present here, a search was reasonable. *See Terry*, 392 U.S. at 27 ("The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others

---

[145]   Exhibit M9 3:06-20; 3:55-5:12.

[146]   *Id.* at 1:02-05.

was in danger."). At a minimum, the deputies were protected by their qualified immunity defense in view of their sensible assumption that reasonable suspicion supported their investigatory stop and the lack of clear precedent to the contrary. *See Taylor*, 575 U.S. at 825.

###### e.   March 31, 2020, Incident

Much like their argument regarding the June 8, 2019, incident, Plaintiffs claim that Defendants violated Plaintiffs' Fourth Amendment rights during an unlawful search on March 31, 2020, while Plaintiffs were performing vehicle maintenance. The facts further support the deputies' reasonable-suspicion determination in this circumstance, though, because Plaintiffs were performing vehicle maintenance at 12:30 a.m. under a tent on a car that did not belong to them. Because the vehicle's license plate was obscured by the tent and another vehicle, the deputies were unable to run the plate in their system to confirm ownership.[147]

The deputies had reasonable suspicion for the investigatory stop arising from their concerns that the vehicle was stolen. *Cf. Rohde v. City of Roseburg*, 137 F.3d 1142 (9th Cir. 1998) (finding that the lack of registration or a title in the driver's name was a lawful factor supporting probable cause for arrest). Although Valadez argues that the deputies exceeded the scope of their investigation, she continued her pattern of combativeness with law enforcement by refusing to exit the vehicle when she was directed to do so. Valadez also alleges that the deputies illegally took her thumbprint as part of the citation-issuance process, but that action does not constitute an unlawful search because her detention was supported by reasonable suspicion. *See United States v. Dionisio*, 410 U.S. 1, 11 (1973) (holding that fingerprinting was a violation of the Fourth Amendment only during unlawful detentions). To the extent that the deputies' search was a violation of Plaintiffs' Fourth Amendment rights, existing authorities to the contrary support Defendants' defense of qualified immunity.

#### 4.   First Amendment Retaliation

Plaintiffs next claim that Defendants retaliated against Plaintiffs because Valadez was exercising her First Amendment rights while recording her various interactions with LASD deputies and by filing multiple complaints. The first issue is whether the facts—viewed in the light most favorable to Valadez—show a violation of her rights. "To recover under § 1983 for such retaliation, a plaintiff must prove: (1) he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in

---

[147]   Defendants' Statement of Facts ¶ 136.

the protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action." *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010).

As described above, Plaintiffs fail on their § 1983 claims for conspiracy, excessive force and denial of medical care, and unlawful search and seizure. In each instance, the deputies acted lawfully during their interactions with Plaintiffs. While Valadez unquestionably has a First Amendment right to film her encounters with law enforcement, *see Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995), there is no evidence that Defendants attempted to chill her exercise of that right or that there is a substantial causal relationship between Valadez's protected actions and Defendants' adverse actions.

To the contrary, the Court has resolved summary judgment largely based upon cellphone video footage of Valadez's interactions with Defendants. Although Valadez was detained for various infractions—the majority of which center on Cal. Penal Code § 148(a)(1) for delaying a lawful investigation and refusing orders relating to vehicle stops—at no point did any Defendant threaten Valadez for recording an interaction. Although various deputies at multiple times asked Valadez to put her cellphone down, those requests were related to legitimate safety or investigatory concerns. *See Donovan*, 2015 WL 993324 at *4 (finding that the plaintiff had no constitutional right to disregard the officer's orders during a lawful traffic stop). As such, Valadez was not engaged in constitutionally protected activities when she was detained during the instances listed in Plaintiffs' Amended Complaint, and she thus fails to satisfy the first *Blair* factor.

Plaintiffs assert that retaliatory intent may be inferred from the temporal proximity between Valadez filming her interactions with the deputies and her subsequent detention.[148] It is true that "timing can properly be considered as circumstantial evidence of retaliatory intent," *Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995), but "[i]n this particular case . . . there is little else to support the inference." *Id.* Even assuming that Defendants' actions chilled Valadez's speech—which is not at all clear, considering that Valadez continued to film every interaction that she had with the deputies—Plaintiffs have not provided any evidence that there was a substantial causal relationship between Valadez's protected constitutional activities and her various detentions. Accordingly, Plaintiffs also fail on the third *Blair* factor.

---

[148]    Opposition 38:19-20.

5.      **Supervisory and Municipal Liability**

In addition to the various deputies named in the above § 1983 claims, Plaintiffs also allege that those deputies' supervisors are liable for failure to supervise their subordinates and that those supervisors ratified the constitutional violations as well as the advanced policies that caused the violations.[149]

A supervisory official may be liable under § 1983 if (1) he or she was personally involved in the constitutional violation; or (2) there was sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.  *See Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011).  Because the Court finds that no subordinate deputy committed any constitutional violations, Plaintiffs cannot sustain a § 1983 claim against those deputies' respective supervisors.

Plaintiffs also allege a *Monell* claim, *see Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), against the County of Los Angeles, claiming that the constitutional violations alleged in the Amended Complaint stemmed from the County's policies.  A local government is liable for an injury under § 1983 under three circumstances:  (1) the local government's policy or custom inflicted the injury; (2) the local government failed to train its employees in a manner that amounts to "deliberate indifference" to a constitutional right; or (3) the individual who committed the constitutional violation was a final decisionmaker or ratified the unconstitutional conduct.  *See Rodriguez v. Cnty. of Los Angeles*, 891 F.3d 776, 803 (9th Cir. 2018).  Here, because Plaintiffs fail to show that Defendants were liable for any constitutional violation, their *Monell* claim likewise fails.

6.      **State Law Claims**

a.      **Negligence**

Plaintiffs allege that Defendants acted negligently relating to the various Fourth Amendment claims for the incidents on June 8, 2019, and March 31, 2020.[150]  Plaintiffs' negligence claims fail for similar reasons as their constitutional claims.  Valadez's negligence claim against Deputy Gomez for the June 8, 2019, incident does not survive summary judgment because there is no genuine dispute of fact that Gomez unintentionally struck Valadez with the car door.

"In order to prove facts sufficient to support a finding of negligence, a plaintiff must show that the defendant had a duty to use due care, that he breached that duty, and

---

[149]      *Id.* at 27:7-11.

[150]      Amended Complaint ¶¶ 155 & 156.

that the breach was the proximate or legal cause of the resulting injury." *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 629 (2013) (internal quotation marks and citations omitted). "Negligence claims stemming from allegations of excessive force by a police officer are . . . analyzed under the Fourth Amendment's reasonableness standard." *Carter v. City of Carlsbad*, 799 F. Supp. 2d 1147, 1164 (S.D. Cal. 2011) (citing *Atkinson v. Cnty. of Tulare*, 790 F. Supp. 2d 1188, 1211 (E.D. Cal. 2011), and noting that negligence is "measured by the same reasonableness standard of the Fourth Amendment"). Police officers have a duty to act reasonably when using force, which "is determined in light of the totality of circumstances." *Id.* Thus, in order to succeed on her negligence claim, Valadez "must show that [Gomez] acted unreasonably and that the unreasonable behavior harmed" her. *Price v. Cnty. of San Diego*, 990 F. Supp. 1230, 1245 (S.D. Cal. 1998).

Here, video evidence shows that Gomez acted reasonably during the interaction and that Gomez did not intentionally close the vehicle door on Valadez. Similarly, Gomez did not act negligently in denying Valadez medical care because video of the interaction shows that Valadez neither suffered serious injury from the vehicle door, nor did her panic attack rise to the level of a medical emergency. Because Gomez's actions are evaluated under the same reasonableness standard used in the Fourth Amendment context, Valadez's claims similarly fail. Additionally, because Gomez did not act negligently during the interaction, Gomez's supervisors were not negligent concerning either Gomez's hiring or supervision, or relating to the investigation of Valadez's complaint against Gomez.

## b.   Battery

Similar to Plaintiffs' negligence claim, their battery claim is appropriately resolved on summary judgment in favor of Defendants because the deputies acted reasonably in all of the incidents alleged by Plaintiffs. Under California law, a plaintiff asserting a battery claim against a law enforcement officer has the burden of proving that the officer used unreasonable force. *See Bowoto v. Chevron Corp.*, 621 F.3d 1116, 1129 (9th Cir. 2010). The reasonableness standard for battery is the same as for the Fourth Amendment violation claims. *See Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1273 (1998) (citing *Graham*, 490 U.S. at 396-97).

Although Plaintiffs assert a battery claim against Deputies Alvarez, Jr., Gomez, Vera, Jr., and Hunziker, all of those deputies acted reasonably under their respective circumstances—as explained above in the § 1983 analysis—and, as a result, Plaintiffs' battery claim fails.

### c.      Bane Act

To prevail on a Bane Act claim, a plaintiff must show that: (1) the defendant interfered with the plaintiff's constitutional or statutory rights; and (2) that interference was accompanied by actual or attempted threats, intimidation, or coercion.  *See Lawman v. City & Cnty. of San Francisco*, 159 F. Supp. 3d 1130, 1151 (N.D. Cal. 2016).  Further, only if plaintiffs "can first establish that [d]efendants violated a constitutional or statutory right can the Court consider whether such interference was the product of threats, intimidation, or coercion." *Id.*  Here, Plaintiffs fail to show that Defendants violated a constitutional or statutory right, and, as a result, Plaintiffs' Bane Act claim fails.  Further, Plaintiffs fail to show that Defendants engaged in any alleged constitutional violations using threats, intimidation, or coercion.  *See Cornell v. City & Cnty. of San Francisco*, 17 Cal. App. 5th 766, 796 (2017), *as modified* (Nov. 17, 2017) ("[t]he statutory framework of section 52.1 indicates that the Legislature meant the statute to address interference with constitutional rights involving more egregious conduct than mere negligence").

### d.      Intentional Infliction of Emotional Distress

Under California law, the elements of an intentional infliction of emotional distress ("IIED") cause of action are: (1) the defendant's outrageous conduct; (2) the defendant's intention to cause, or reckless disregard of the probability of causing, emotional distress; (3) severe emotional distress; and (4) an actual and proximate causal link between the tortious conduct and the emotional distress.  *See Wilkerson v. Butler*, 229 F.R.D. 166, 171 (E.D. Cal. 2005).  The "[c]onduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Id.* (citing *Davidson v. City of Westminster*, 32 Cal. 3d 197, 209 (1982)).  "Conduct is extreme and outrageous when it is of a nature which is especially calculated to cause, and does cause, mental distress." *Id.*  Conversely, "[l]iability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Id.*

Plaintiffs' IIED claim fails under the same reasonableness analysis applicable to their § 1983 claims.  Although Plaintiffs allege that Defendants engaged in a multi-year harassment campaign against them, in each individual incident that Plaintiffs describe in their Fourth Amendment-based claims for relief, the deputies acted reasonably in pursuing legitimate law enforcement functions.  The Court has considered Plaintiffs' allegations that unidentified deputies harassed Plaintiffs, outside of the incidents detailed in the Amended Complaint, and it concludes that those claims do not meet the standard for liability established in *Wilkerson*.

## C.      Plaintiffs' Request for Additional Discovery

Plaintiffs contend that Defendants failed to comply with their discovery obligations.  Plaintiffs assert that Defendants impeded discovery by tampering with

depositions as "part of a litigation strategy of obstruction."[151]  Plaintiffs ask the Court to deny Defendants' Motion, or, in the alternative, to delay ruling on the Motion until discovery is completed.[152]  Plaintiffs' request is largely duplicative of an *ex parte* application that Plaintiffs filed in November 2022, through which they sought an amendment of the Court's Scheduling Order.[153]  The Court denied that application because of Plaintiffs' failure to pursue depositions in a timely manner or to adhere to the discovery cut-off date.[154]

Although Plaintiffs object to Defendants' alleged gamesmanship during depositions and discovery, Plaintiffs never filed a motion to compel nor otherwise sought relief from the Court.  Even though the Court denied Plaintiffs' *ex parte* application to amend the Scheduling Order, the Court granted a compromise schedule that Defendants proposed.  Despite the fact that discovery was open from October 2020 until November 2022, the Court extended fact discovery through late December 2022 in order for Plaintiffs to conduct additional depositions.  Because Plaintiffs were largely responsible for their own failure diligently to pursue discovery, Plaintiffs' instant request to delay a ruling on Defendants' motion until further discovery is completed is **DENIED**.

## IV.  DISPOSITION

For the foregoing reasons, the Court hereby **ORDERS** as follows:

1.      Defendants' instant Motion for Summary Judgment is **GRANTED** in full. Plaintiffs' Amended Complaint is **DISMISSED with prejudice**.

2.      Plaintiffs' request for judicial notice is **GRANTED in part** and **DENIED in part**, as set forth above.

3.      Plaintiffs' request to delay ruling on Defendants' Motion to allow for additional discovery is **DENIED**.

---

[151]    Opposition 41:18-19.

[152]    *Id.* at 39:8-10.

[153]    *See* Pls.' *Ex Parte* Appl. to Am. Scheduling Order [ECF No. 99].

[154]    *See* Order Denying Pls.' *Ex Parte* Appl. [ECF No. 108].

4.      Judgment will issue accordingly.

**IT IS SO ORDERED.**

Dated:_____June 24, 2024_____                    _____

John W. Holcomb
UNITED STATES DISTRICT JUDGE